# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT
## BRIDGEPORT DIVISION

| | | |
|---|---|---|
| In re: | ) | Cause No. 3:05-cv-796 |
| | ) | |
| BRITESTARR HOMES, INC. | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | 02-50811 (AHWS) |
| | ) | |
| BRITESTARR HOMES, INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | May 27, 2005 |
| | ) | |
| PIPER RUDNICK, LLP, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S LOCAL RULE 56(a)(2) STATEMENT

Pursuant to Local Rule 56(a)(2), plaintiff Britestarr Homes, Inc. (Britestarr) responds to Defendant's Local Rule 56(a)1):

1.      Admitted.

2.      Admitted.

3.      Admitted.

4.      Admitted.

5.      Denied as to all three sentences.  Specifically, Piper's record cite does not indicate that this activity took place "shortly after" Britestarr acquired its property.  *See* Amd. Comp., ¶ 31.  Further, the Oak Point Associates entity must be incorporated into these facts to make these sentences accurate. *See id.*  Further, the regulators shut down Britestarr's business for violating its recycling facility operating permit.  (Def.'s Ex. 65).

Finally, Piper's record cite does not indicate that this activity caused Britestarr to default on the Lloyds loan. *See* Amd. Comp., ¶ 31.

6.      Plaintiff admits the facts contained in the first sentence. Plaintiff denies the facts contained in the second sentence because whether Ms. Norkin actually conveyed the Britestarr shares is a disputed fact, which was actually being litigated. *See Oak Point Property, Inc. v. Norkin Comp.* (Def.'s Ex. 72).

7.      Denied as to both sentences. The document Piper cites does not indicate that Mrs. Norkin agreed that her husband was the owner, it simply states "[the husband is the owner. . . ." *See* Def.'s Ex. 24 at ¶ 3.3, and it does not indicate that she agreed that he would retain ownership, it simply states "the husband shall retain ownership. . . ." *See id.*

8.      Admitted.

9.      Denied. Whether the record contains evidence of something is not a material fact. The evidence itself constitutes a material fact. The evidence on this issue is that Lloyds' February 11, 1991 letter (Def.'s Ex. 26) indicates that it had notice of the divorce, but it does not indicate whether Lloyds objected or not and it does not indicate whether Lloyds had notice of the conveyance such that Lloyds knew that it could object. Lloyds later filed suit against both David and Friema Norkin. *See* Def.'s Ex. 27.

10.     Admitted.

11.     Admitted.

12.     Admitted.

13.     Admitted.

2

14.     Admitted.

15.     Admitted if the Oak Point Associates entity is added.  *See* Amd. Comp., ¶ 31.

16.     Denied.  Britestarr submitted a plan, which was not acted on by the State Department of Environmental Conservation.  (Def.'s Ex. 65)

17.     Plaintiff denies the facts contained in the first sentence.  It is a fact issue as to whether the loan terms contained "exorbitant" fees and interest rates.  Plaintiff admits the facts contained in the second sentence.

18.     Admitted.

19.     Admitted.

20.     Admitted.

21.     Admitted.

22.     Admitted.

23.     Admitted.

24.     Admitted.

25.     Admitted.

26.     Admitted.

27.     Denied as to both sentences.  Piper's two cites do not indicate that Norkin asked Piper to open the account or that Mr. Beatman advised Mr. Norkin to open an account with Piper.  *See* Amd. Comp., ¶ 26; Def.'s Ex. 14.

28.     Admitted.

29.     Plaintiff denies the facts contained in the first sentence.   There is a factual dispute on whether Mr. Norkin made these requests to Piper in his personal capacity, as evidenced by the disbursement requests that he sent to Piper, *see, e.g.*, February 14, 2001

disbursement request (Pl.'s Ex. 60), in which he asked for money to be spent on personal items. Plaintiff admits the facts contained in the second sentence.

    30.     Denied. (Pl.'s Ex. 18).

    31.     Admitted.

    32.     Denied. The parties "negotiated" several issues that affected the option agreement. *See* Def.'s Exs. 40, 46, 50-53. But ABB was committed to closing on the Option Agreement up until September 2002. *See infra* at ¶ 95. In fact, when these negotiations broke down ABB filed a lawsuit to obtain an injunction to preserve the option agreement. *See* Def.'s Ex. 55. Norkin testified that Piper received at least some portion of this correspondence. *See* Norkin II Tr. at 166-67 (Pl.'s Ex.20.

    33.     Admitted.

    34.     Admitted.

    35.     Admitted.

    36.     Plaintiff admits the facts contained in the first and second sentences. Plaintiff denies the facts contained in the third sentence. *See supra* at ¶ 32.

    37.     Admitted if Piper makes the following highlighted change: "subtracting the amount of the option payments from the ultimate purchase price *if used to pay off Britestarr or Norkin creditors.*" *See* Def.'s Ex. 51, ¶2.6.

    38.     Admitted if Piper rephrases to say that "Based on Britestarr's representation that an agreement would be reached. . . ."

    39.     Denied. Piper left out a critically important fact that it advised Mr. Norkin to reject ABB's proposals. *See* Norkin I Tr. at 9-12.

40.     Plaintiff denies the facts contained in the first sentence. It is unclear from Piper's cite whether the manner in which Norkin responded to ABB's proposal was "consistent with his view" of it as a "joke" or because Piper had advised him to reject it. *See supra* at ¶ 39. Plaintiff admits the facts contained in the second sentence.

41.     Denied. The fact that Norkin testified that he would never do something is not a material fact. The fact is whether Norkin indeed never would have signed an agreement containing the provisions that ABB proposed. There is a fact issue because the evidence indicates that Norkin followed Piper's advice (*see* Norkin I Tr. at 21-22 (Pl.'s Ex. 19); Norkin II Tr. at 235) and, therefore, a jury could reasonably conclude that Norkin would have followed that advice. Indeed, Norkin followed Piper's advice recommending that he put his company into bankruptcy and resign his position as president. *See* Pl.'s Ex. 17 at Interrog. No. 13.

42.     Admitted if Piper adds a critically important fact that ABB withdrew the offers only after Britestarr failed to accept them.

43.     Admitted.

44.     Denied. Based on Norkin's testimony, it appears that Dean Colucci arranged the meeting with Mirant after Norkin gave him the phone number for the Mirant representative, although Norkin does not remember the exact circumstances. *See* Norkin II Tr. at 176

45.     Admitted.

46.     Whether the record contains evidence of something is not a material fact. The evidence itself constitutes a material fact. Hence, Britestarr does not know how to respond to this item. This item also does not contain a cite reference.

5

47.    Admitted.

48.    Admitted.

49.    Admitted if Piper includes a time frame beginning in fall 2001, i.e., "but in fall 2001 Britestarr consulted Buchanan Ingersoll about the discussions as well." *See* Def.'s Exs. 64 and 69.

50.    Admitted.

51.    Admitted.

52.    Admitted.

53.    Plaintiff admits the facts contained in the first sentence.  Plaintiff denies the facts contained in the second sentence.  (Def.'s Ex. 12)

54.    Admitted.

55.    Admitted.

56.    Plaintiff admits the facts contained in the first two sentences.  Plaintiff denies the facts contained in the third sentence because the Bronx lawsuit constituted an injunction to maintain the status quo.  (Def.'s Ex. 73).

57.    Plaintiff admits the facts contained in the first sentence.  Plaintiff denies the facts contained in the second sentence.  (Def.'s Ex. 75)  Plaintiff admits the facts contained in the third sentence.

58.    Plaintiff admits the facts contained in the first sentence.  Plaintiff denies the facts contained in the second sentence because the manner in which Mr. Fenton testified is not a material fact.

59.    Plaintiff admits the facts contained in the first sentence. Plaintiff denies the facts contained in the second sentence.  (Pl.'s Ex.21 at 220-222, 244).

6

60.     Admitted.

61.     Admitted

62.     Admitted.

63.     Plaintiff admits the facts contained in the first sentence if Piper removes the phrase "believed that after the ABB option expired."   Plaintiff denies the facts contained in the second sentence.  (Def.'s Ex. 14 at 199).

64.     Plaintiff denies the facts contained in the first sentence.  *See* Amd. Comp., ¶ 35.  Plaintiff denies the facts contained in the second sentence.   *See* Ex. 16 at 39-41. Plaintiff denies the facts contained in the third sentence.  *See* Ex. 79.

65.     Admitted if Piper adds the critical highlighted fact: "prompted Galea and Kruse to declare a default under the forbearance agreement and, *until an injunction was issued*, to threaten to foreclose."

66.     Admitted.

67.     Denied.  ABB was willing to settle with Britestarr in spring 2002.  There is a fact issue on what the terms of that settlement would be but ABB testified that it could not have made a proposal any less "sweet" than the proposal it made a year earlier in March 2001, which would have provided Britestarr with over $1.4 million to pay off these debts. *See* Henry Tr. at 220:17 to 222:15, 244 (Pl.'s Ex. 21); *see* Def.'s Ex. 52 at ¶ 15.

68.     Admitted.

69.     Admitted.

70.     Britestarr admits that partly because Piper mishandled Britestarr's escrow account, Britestarr did not have substantial funds in spring 2002 but that because no

7

creditors were threatening, it could have easily avoided bankruptcy and ensured its survival for the future by negotiating with ABB EV for an extension of the Option Agreement. *See* Def.'s Ex. 10 at 244.

71.    Admitted.

72.    Denied.  Piper advised Norkin to resign, he did not simply agree to step down. *See* Norkin I Tr. at 29 (Pl.'s Ex.19).

73.    Admitted.

74.    Admitted.

75.    Plaintiff admits the facts contained in the first sentence.  Plaintiff denies the facts contained in the second sentence.  Whether the Court can take judicial notice of something is not a material fact.  The evidence itself constitutes a material fact.  Plaintiff admits that the New York court took no action on the trustee motion.

76.    Whether the Court can take judicial notice of something is not a material fact. The evidence itself constitutes a material fact.   Piper did not provide a cite reference. Plaintiff admits that the Connecticut bankruptcy court transferred the Britestarr case to Connecticut.

77.    Britestarr admits the facts in this sentence if Piper removes "ABB had approached" and "persuaded them."

78.    Admitted.

79.    Denied. *See* Def.'s Ex. 88.

80.    Whether the record contains evidence of something is not a material fact. The evidence itself constitutes a material fact.  Hence, Britestarr does not know how to respond to this item.  This item also fails to contain a cite reference.

8

81.     Denied. *See* Pl.'s Ex. 7.

82.     Britestarr admits that ABB issued these letters but Britestarr denies that the letters reflect the entire basis for why ABB decided to exit the Oak Point project.

83.     Denied. Piper's cite indicates that until September 2002, ABB was committed to close, but the cite does not indicate that as of then ABB no longer viewed the project as a viable project if outside of bankruptcy.

84.     Admitted.

85.     Denied, because ABB was interested in funding development of the Oak Point project beyond September 2002 until it realized about a week earlier that the Britestarr bankruptcy would require additional time and money. *See* Def.'s Ex. 71; *see* Pl.'s Ex. 7.

86.     Denied. Mr. Henry, ABB's counsel, testified that at least at one point in time he did not believe the bankruptcy was necessarily a bad thing, but this was before the Britestarr creditors' and lawyers' meeting in August 2002. After that meeting, Mr. Henry ultimately believed, along with Malcolm Preece, ABB EV President, that ABB EV should no longer continue developing the project due to the additional time and expense created by the bankruptcy. *See* Pl.'s Ex. 7. And he also testified that his ABB colleagues may not have agreed with him. *See* Henry Tr. at 226.

87.     Denied. Mr. Henry, ABB's counsel, testified that at least at one point in time he did not believe the bankruptcy was necessarily a bad thing, but this was before the Britestarr creditors' and lawyers' meeting in August 2002. After that meeting, Mr. Henry ultimately believed, along with Malcolm Preece, ABB EV President, that ABB EV should no longer continue developing the project due to the additional time and expense created

9

by the bankruptcy. *See* Pl.'s Ex. 7. And he also testified that his ABB colleagues may not have agreed with him. *See* Henry Tr. at 226.

88.    Admitted.

89.    Admitted if Piper revises it to read "ABB conveyed a portion of its development rights, which did not include the Option Agreement."

90.    Denied. *See* Def.'s Ex. 95.

91.    Admitted.

92.    Admitted, but ABB waived its claim under the Britestarr plan of reorganization.

93.    Admitted it Piper revises this sentence to read: "During the latter half of 2001 and all of 2002, Piper served as project counsel for [TransGas], the developer of a proposed power plant in Brooklyn, but did not so advise Britestarr."

94.    Britestarr admits the facts contained in the first sentence if Piper adds the following to the end of it: "although Piper's development-and-damages expert contends that financing for projects was limited during 2001, 2002, and 2003." (See Pl.'s Ex. 5)

95.    Admitted if Piper inserts the word "debt" in front of "8.05%."

## BRITESTARR'S DISPUTED ISSUES OF MATERIAL FACTS

1.     New York City has been on the verge of an energy crisis since the late 1990's. (Pl.'s Ex.2)

2.     At all relevant times, New York City was desperate for more power generation capacity and faced a growing disparity between electricity demand and in-state supply. (Pl.'s Ex.2)

3.     Britestarr owned a large industrial site (the Oak Point site) in the Bronx, New York, that was ideally-suited to serve as home to a large power plant. (Pl. 'S Ex.4 at ¶ 3)

4.     Piper recognized that Britestarr's property was both rare and of great value for development as a power plant. (Pl.'s Ex.4 at ¶ 3)

5.     Aside from its property, Britestarr was a modest company with no other sizable assets. (Def.'s Ex. 84)

6.     In 1999, Britestarr and ABB EV entered into an Option Agreement concerning the sale of Britestarr's land and development as a power plant. (Def.'s Ex.31)

7.     At all relevant times, ABB EV was a profitable power-plant developed and a subsidiary of the ABB Group, one of the world's largest energy companies. (Pl.'s Ex.4)

8.     The Oak Point project was merely an expansion of ABB EV's successful project development business. (Pl.'s Ex.6)

9.     ABB EV intended to develop the Oak Point site as a gas-fueled electric power plant with a capacity of approximately 1100 MW. (Pl.'s Ex.4)

10.     Under the Option Agreement, Britestarr received incremental option

11

payments totaling $1.4 million over a period of 3 years in exchange for the option to purchase Britestarr's land. (Def.'s Ex.31)

11.     The Option Agreement was essentially a real-estate contract of sale. (Pl.'s Ex. 4 at ¶ 36)

12.     The minimum purchase price in the Option Agreement was $31.4 million, with the possibility of much more based upon a formula in the Agreement. (Def.'s Ex.31)

13.     The Option Agreement, contained an equity interest feature. (Def.'s Ex 31)

14.     The equity interest feature granted Britestarr a percentage interest in future revenues of the Oak Point plant as well as the plant itself and the land. (Def.'s Ex.31)

15.     Piper knew the potential value of both the minimum purchase price and the equity interest feature in the Option Agreement. (Pl.'s Ex. 8)

16.     Piper valued the equity interest feature at $225 million when it drafted, filed, and served suit against ABB EV on Britestarr's behalf of for allegedly breaching the Option Agreement. (Pl.'s Ex. 4 at ¶ 54)

17.     Britestarr retained Piper to represent its interests in connection with the ABB EV Option Agreement, the development of its property as an electric power plant, and its related participation as an equity interest owner in the project. (Pl.'s Ex. 8)

18.     In 1999 and 2000, Piper billed only fifty hours to the Oak Point project. (Pl.'s Ex. 9)

19.     In 1999 and 2000, Piper ignored pressing site control issues that required resolution in order to permit the development of the Oak Point project to proceed. (Def.'s Ex. 46) ; (Def.'s Ex. 52)

20.     At all relevant times, ABB EV was proceeding with project development in

12

good faith  with the intention to purchase Britestarr's property to develop the Oak Point power project.

21.    At all relevant times, ABB EV was financially able to pursue development of the Oak Point project. (Pl.'s Ex. 4 at ¶ 9)

22.    ABB EV pursued development of the Oak Point project by retaining the nation's leading consultants in the power industry to assist with project development. (Def.'s Ex. 10) ; (Pl.'s Ex. 11)

23.    In late 2000 and early 2001, ABB EV recognized that several Britestarr creditors, and possibly several Norkin creditors could threaten control of the site in connection with collecting their debts. (Def.'s Ex. 46) ; (Def.'s Ex. 52)

24.    ABB EV began working with Britestarr to resolve this issue involving the Britestarr and Norkin creditors.  (Def.'s Ex. 49).

25.    In early 2001, Buchanan Ingersoll, Britestarr's primary litigation counsel worked out a deal with ABB EV to address site control issues due to creditors, and in fact ABB paid $275,000 to one of Britestarr's creditors as consideration of their agreement for foreclosing on the property. (Pl.'s Ex. 12 at 11) ; (Pl.'s Ex. 13 at 12); (Def.'s Ex. 49).

26.    Piper's simultaneous representation of both Britestarr and Mirant with respect to potential development of the Oak Point project constituted a conflict of interest. (Pl.'s Ex. 29 at 160)

27.    In 2001, Piper interfered with the contractual relationship between ABB EV and Britestarr by attempting to divert the Oak Point project from ABB EV to its client Mirant. (Pl.'s Ex. 12 at 98-102) ; (Pl.'s Ex. 19 at 13, 14)

28.    In 2001, Piper advised Britestarr that ABB EV would be unable to perform

13

under the Option Agreement. (Pl.'s Ex. 19 at 10-11)

29.    In 2001, Piper told Britestarr that another developer would offer more money. (Pl.'s Ex. 19 at 13, 14)

30.    In mid-March 2001 Piper hosted a meeting at Piper's offices between Britestarr and Mirant to discuss the Oak Point project. (Pl.'s Ex. 15)

31.    Prior to the March 2001 meeting, Buchanan Ingersoll attorney Fenton advised his former Piper colleagues that due to an injunction that ABB EV had recently obtained, Fenton had counseled Britestarr not to have a meeting with Mirant. (Pl.'s Ex.15)

32.    In 2001, Piper billed numerous hours (as compared to fifty hours in the preceding two years) working to consummate a transaction between its two clients, Mirant and Britestarr. (Pl.'s Ex.9)

33.    In early 2001, Piper advised Britestarr to move the Oak Point project away from ABB EV to its own client Mirant. (Pl.'s Ex. 19 at 10-11)

34.    Piper had an incentive to advise Britestarr to move forward with its own client, where Piper had the potential to be project counsel, which could potentially yield millions in legal fees. (Pl.'s Ex.14 at 73)

35.    Piper's advice that Britestarr should attempt to move the project to another developer halted project development and caused ABB EV not to purchase Britestarr's property. ( Pl.'s Ex. 12 at 98-102)

36.    Buchanan Ingersoll attorney Paparo was concerned that Piper had a conflict in advising Britestarr to select between two developers, one of which was its own client. (Pl.'s Ex. 13 at 110)

37.    Piper never disclosed its simultaneous representation of Britestarr and Mirant

to Britestarr. (Pl.'s Ex. 19 at 12)

38.     Piper never obtained Britestarr's consent to the conflict arising from simultaneous representation of both Britestarr and Mirant. (Pl.'s Ex.19 at 12)

39.     In early 2001, ABB EV made several proposals  to extend the Option Agreement. (Def.'s Ex. 52)

40.     ABB EV's March 2001 offer to extend the Option Agreement provided that Britestarr would receive an additional $1.2 million in option payments to: (1) address creditor issues; and (2) extend the option period for the time required to obtain the permit (plus extra time to account for any delays). (Def.'s Ex. 52)

41.     Britestarr, ABB EV, and their counsel understood that if they could not reach an agreement, project development would be halted indefinitely and litigation would ensue over how to address these creditor issues. (Pl.'s Ex. 12 at 98-102)

42.     Buchanan Ingersoll lawyers Fenton and Paparo advised Britestarr to continue project development with ABB EV. (Pl.'s Ex.12 at 11); (Pl.'s Ex.13 at 12)

43.     Piper's advice to Britestarr that Mirant provided a better deal caused negotiations to extend the ABB EV Option Agreement to fail. (Pl.'s Ex. 20 at 235)

44.     Absent Piper's conflicted advice, Britestarr would have accepted ABB EV's March 2001 offer to extend the Option Agreement. (Pl.'s Ex. 20 at 235)

45.     Britestarr's rejection of the March 2001 offer to extend the Option Agreement caused ABB EV to not pursue the permit, halt virtually all project development, and initiate litigation to address the creditor issues to secure site control.  (Pl.'s Ex. 12 at 98-102) .

46.     Britestarr's rejection of ABB EV's March 2001 offer to extend the Option

Agreement caused ABB EV not to exercise the Option Agreement and purchase Britestarr's land. (Pl.'s Ex. 12 at 98-102)

47.    Between Fall 2000 and Spring 2002, Piper disbursed over $1 million from a Britestarr escrow account to Britestarr's president, who was in personal bankruptcy. (Pl.'s Ex. 18)

48.    Britestarr's escrow account was managed by Piper and contained incremental option payments made by ABB EV under the Option Agreement. (Pl.'s Ex. 18)

49.    Much of the money Piper disbursed from Britestarr's escrow account was for David Norkin's personal expenses. (Pl.'s Ex. 18)

50.    Piper's mismanagement of Britestarr's escrow account diverted funds needed to address site control issues such as potential claims by Britestarr creditors. (Def.'s Ex. 46); (Def.'s Ex. 52)

51.    Piper's mismanagement of Britestarr's escrow account caused ABB EV not to exercise the Option Agreement and purchase Britestarr's land. (Def.'s Ex. 46) ; (Def.'s Ex. 52)

52.    No later than March 2005, Piper became concerned that its disbursements to Britestarr's president for his personal use might constitute bankruptcy fraud, as those funds arguably belonged to his personal bankruptcy estate. (Pl.'s Ex. 16)

53.    Piper did not conduct an investigation of its concern about potential bankruptcy fraud. (Pl.'s Ex. 17)

54.    Piper's mishandling of the escrow account cost Britestarr over $1 million in damages. (Pl.'s Ex. 18)

55.    During the latter half of 2001 and all of 2002, Piper served as lead project

16

counsel for the TransGas Project. (Pl.'s Ex. 17 at no. 62)

56.     Both the Oak Point project and TransGas project sought to develop new large plants in New York City. (Pl.'s Ex. 38)

57.     Both the Oak Point project and TransGas project were directly competing for power purchase agreements and development resources. (Pl.'s Ex. 5 at 145, 174-76)

58.     Piper lawyer Dean Colucci, the Piper lawyer who billed the most hours to Britestarr's Oak Point project also worked on the TransGas project. (Pl.'s Ex. 14 at 53)

59.     Piper lawyer Nick Sarad, senior project counsel for the TransGas project, also worked on the Oak Point project. (Pl.'s Ex. 9 at 38)

60.     Piper's simultaneous representation of both Britestarr and Mirant with respect to potential development of the Oak Point project constituted a conflict of interest. (Pl.'s Ex. 30 at 151-52)

61.     Piper never disclosed its simultaneous representation of Britestarr and TransGas to Britestarr. (Pl.'s Ex. 14 at 53-55) ; (Pl.'s Ex. 19 at 39-41)

62.     Piper never obtained Britestarr's consent to the conflict arising from simultaneous representation of both Britestarr and TransGas. (Pl.'s Ex. 14 at 53-55) ; (Pl.'s Ex. 19 at 39-41)

63.     In late 2002, both the Oak Point project and the TransGas project bid on a power purchase agreement for half of the Oak Point project's capacity. (Pl.'s Ex. 38)

64.     In Spring 2002, ABB EV wanted to settle pending disputes and move forward with Oak Point project development. (Pl.'s Ex. 21 at 221)

65.     In March 2002, attorneys for Britestarr and ABB EV met to discuss settling and resuming Oak Point project development. (Pl.'s Ex. 9 at 40) ; (Pl.'s Ex. 22 at 181)

17

66.    Piper represented Britestarr at the March 2002 settlement conference. (Pl.'s Ex. 14 at 57-58)

67.    At the time of the March 2002 settlement conference, ABB EV was willing to settle pending disputes by extending the Option Agreement for one year on certain terms that allowed ABB EV to obtain the permit and then purchase the property, and provided Britestarr with another $1.2 million in option payments. (Pl.'s Ex. 21 at 220-222, 244)

68.    Piper did not convey ABB EV's willingness to settle pending disputes and extend the Option Agreement to Britestarr. (Pl.'s Ex. 19 at 21)

69.    In March 2002, Piper learned  that a trustee would soon be appointed over Mr. Norkin's estate because his personal bankruptcy case would be converted from Chapter 11 to Chapter 7. (Pl.'s Ex. 9 at 42)

70.    Piper advised Britestarr to file bankruptcy without disclosing the TransGas conflict. (Pl.'s Ex. 14 at 53-55) ; (Pl.'s Ex. 19 at 39-41)

71.    Piper advised Britestarr to file bankruptcy without relaying ABB EV's willingness to negotiate an extension of the Option Agreement to Britestarr.   (Pl.'s Ex.19 at 21)

72.    David Norkin or the trustee for Mr. Norkin's estate would have reached agreement with ABB EV to extend the Option Agreement and receive an additional $1.2 million in option payments whether or not Piper had recommended that course of action. (Pl.'s Ex. 25)

73.    Piper advised Britestarr that bankruptcy was necessary because Britestarr could not liquidate the property until it eliminated the ABB EV Option Agreement.  (Pl.'s Ex. 42 at No. 13)

18

74.     Piper planned for Britestarr to reject the Option Agreement in the bankruptcy as an executory contract and then have Britestarr to liquidate the Option Agreement in a bankruptcy auction. (Pl.'s Ex. 42 at No. 13)

75.     When Piper placed Britestarr into bankruptcy, there were no creditors threatening to pursue collection of their debts against Britestarr. (Pl.'s Ex. 23 at 10)

76.     Piper's bankruptcy plan was inconsistent with the highest and best use for Britestarr's property, as a power-plant site. (Pl.'s Ex. 22 at 24)

77.     Piper's decision to place Britestarr in bankruptcy caused Britestarr to lose its rights to sell its property as a power-plant site because a sale of its property as a permitted power-plant site was replaced in favor of a bankruptcy sale.  (Pl.'s Ex. 42 at No. 13)

78.     Piper's decision to place Britestarr in bankruptcy was caused by Piper's conflicted representation of Britestarr and TransGas. (Pl.'s Ex. 30 at 151)

79.     The market for power plant development was not "moribund" in Spring 2002. (Pl.'s Ex. 43)

80.     Piper was convinced of the value of Britestarr's asset just months before the bankruptcy. (Pl.'s Ex. 22 at 24, 26, 46)

81.     Piper's bankruptcy plan did not account for the environmental issue associated with the property that presented Britestarr from selling its property for decent value in the bankruptcy. (Pl.'s Ex. 31 at 25)

82.     Piper's bankruptcy plan failed to recognize that any purchaser in the bankruptcy would take the property subject to between $3 million and $19 million environmental remediation costs. (Pl.'s Ex. 31 at 25)

83.     Piper repeatedly instructed Britestarr president David Norkin not to disclose

the prospective bankruptcy to anyone. (Pl.'s Ex. 19 at 26)

84.    Piper decision to place Britestarr in bankruptcy was not in the best interest of creditors and shareholders, which would have been better served by extension of the ABB EV Option Agreement and the receipt of additional incremental option payments. (Pl.'s Ex. 35)

85.    Piper's decision to place Britestarr into bankruptcy effectively extinguished the Option Agreement, causing ABB EV not to purchase Britestarr's land. (Pl.'s Ex. 42 at No. 3)

86.    Piper drafted, filed, and served a suit against ABB EV for $225 shortly after Britestarr was placed in bankruptcy. (Pl.'s Ex. 58 at 151)

87.    The suit against ABB EV was based upon Piper's valuation of the equity interest in the Option Agreement. (Pl.'s Ex. 4 at ¶ 54)

88.    While Piper claimed the market was moribund, a competing project, the SCS Astoria plant, was built directly across the East River from the Oak Point site. (Pl.'s Ex. 26)

89.    Once the project received a permit, ABB EV or another developer would have immediately exercised the option and purchased the land. (Pl.'s Ex. 7 at ¶ 8)

90.    Absent Piper's wrongful conduct, ABB EV or another developer would have likely have successfully obtained an Article X permit for construction of the plant. (Pl.'s Ex. 5 at 268) ; (Pl.'s Ex. 44 at 52) ; (Pl.'s Ex. 46, 47, 48) ; (Pl.'s Ex. 43 at 14-15)

91.    Eight of the ten New York City projects that applied for a permit during the time period relevant to this suit obtained a permit. (Pl.'s Ex. 43 at 14-15)

92.    Two of ten New York City projects that applied for a permit during the time

period relevant to this suit simply failed to complete the permitting process. (Pl.'s Ex. 43 at 14-15)

93.     Throughout 2001, 2002, 2003, and 2004, a number of developers either expressed interest in participating in the Oak Point project or made a financial investment developing the Oak Point property. (Pl.'s Ex. 53, 54, 55, 56)

94.     ABB EV was able to sell its rights in several projects to other developers that continued developing projects and preserved underlying Option Agreements. (Pl.'s Ex. 42 at 12-13)

95.     Absent Piper's wrongful conduct, ABB EV would likely have been able to sell or otherwise transfer its rights to another developer if it had decided to modify its involvement in the Oak Point plant at any time relevant to this suit. (Pl.'s Ex. 42 at 12-13)

96.     Absent Piper's wrongful conduct, ABB EV or another developer would likely have been able to secure financing on acceptable terms permitting profitability for the Oak Point project. (Pl.'s Ex. 43)

97.     Absent Piper's wrongful conduct,  ABB EV or another developer would likely have been able to negotiate a construction contract or contracts on acceptable terms permitting profitability for the Oak Point project. (Pl.'s Ex. 43) ; (Pl.'s Ex. 5 at 156)

98.     Absent Piper's wrongful conduct, the Oak Point plant would likely have been built and have generated the profits projected by the market. (Pl.'s Ex. 43)

99.     Absent Piper's wrongful conduct, the Oak Point plant would have secured a power purchase agreement guaranteeing the sale of a portion of its capacity. (Pl.'s Ex. 43) Pl.'s Ex. 38)

100.   New York's strong demand for power causes electricity to be dispatched at

a much higher rate than in most markets. (Pl.'s Ex. 7)

101.    Once the Oak Point plant was built, it would have been able to sell its generation into the power-starved New York energy, capacity, or ancillary markets or other markets, either as a merchant plant or subject to a power purchase agreement. (Pl.'s Ex.7)

102.    There are very few variables impacting profitability of a power plant in the New York City market. (Pl.'s Ex. 7)

103.    ABB EV or another developer would have been able to secure natural gas to fuel the plant at an index price permitting profitable operation of the plant. (Pl.'s Ex. 7)

104.    New York City's strong demand for power insures power plant development and profitability for new power plants without regard to whether the plants are initially able to obtain a power purchase agreement. (Pl.'s Ex. 7)

105.    At all relevant times, New York City's strong demand for power was overall unabated by economic events external to the development of the Oak Point project. (Pl.'s Ex. 7)

106.    At all times relevant to this suit, New York City's strong demand for power led new and existing monetary funds to purposefully seek viable investment opportunities in the area of new plant generation in New York City. (Pl.'s Ex. 7)

107.    The constantly increasing and critical need for more available power in New York City creates a market that automatically adjusts for and guarantees that new generation will be profitable. (Pl.'s Ex. 7)

108.    New York City regulators like NYISO, New York Public Service Commission,

and others compile data, publish rules, and promulgate regulations designed to ensure a reliable supply of electricity at predictable prices and to promote the development of additional capacity. (Pl.'s Ex. 1)

109.    Whenever profitability for new generation is threatened, New York City regulators take measures to encourage new power plant development, including the promotion of additional long term power purchase agreements. (Pl.'s Ex. 7)

Respectfully submitted,

*Michael Caddell*

Melissa Zelen Neier
CT25055
Ivey, Barnum, & O'Mara
170 Mason Street
Greenwich, Connecticut 06830
Phone: 203.661.6000
Fax: 203.661.9462
Counsel for Plaintiff

Michael A. Caddell
SBT No. 03576700
Caddell & Chapman
1331 Lamar, Suite 1070
Houston, TX 77010-3027
Telephone: 713.751.0400
Facsimile: 713.751.0906

ATTORNEY-IN-CHARGE FOR
PLAINTIFF

Appointed as Special Litigation Counsel
by order of this Court dated June 2,
2003.

OF COUNSEL:

Cynthia B. Chapman
SBT No. 007963339
Gregory K. Evans
SBT No. 24002065
Caddell & Chapman
1331 Lamar, Suite 1070
Houston, TX 77010-3027
713.751.0400 Telephone
713.751.0906 Facsimile

## CERTIFICATE OF SERVICE

I certify that on May 27, 2005, I served a true copy of the foregoing document on the following counsel of record by facsimile and certified mail, return receipt requested:

William S. Fish, Jr.
Tyler Cooper & Alcorn, LLP
185 Asylum Street
CityPlace I - 35th Floor
Hartford, CT 06103-3488

*Attorney for Defendant Piper Rudnick, LLP*

James P. Ulwick
Kramon & Graham, P.A.
One South Street - Suite 2600
Baltimore, Maryland 21202-3201

*Attorney for Defendant Piper Rudnick, LLP*

_____
Gregory K. Evans