# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

BRITESTARR HOMES, INC.,
     Plaintiff,

     v.

PIPER RUDNICK LLP,
     Defendant.

Civil Action No.
3:05cv796 (SRU)

## MEMORANDUM OF DECISION

Britestarr Homes, Inc. ("Britestarr") has filed suit against the law firm Piper Rudnick LLP ("Piper"),[1] asserting five causes of action: breach of fiduciary duty, aiding and abetting breach of fiduciary duty, civil conspiracy, professional malpractice, and tortious interference with business relations. The claims principally arise out of the law firm's recommendation that Britestarr seek Chapter 11 bankruptcy protection.

Britestarr has failed to raise a triable issue of fact with respect to damages, an essential element of the first four claims. With respect to the fifth cause of action, tortious interference with business relations, Britestarr has failed to raise a triable issue of material fact with respect to injury to a business relationship, an essential element of that claim.

Piper's motion for summary judgment is, therefore, granted.

## I.    Standard of Review

Summary judgment is appropriate when the evidence demonstrates that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a

---

[1] The former Piper Rudnick LLP is now part of an international organization of law practices known as DLA Piper. As a member of that organization, DLA Piper US LLP provides services throughout offices in the United States. *See* <http://www.dlapiper.com/global/termsconditions/structure> (last visited Sept. 11, 2006).

matter of law."   Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

256 (1986) (plaintiff must present affirmative evidence in order to defeat a properly supported

motion for summary judgment).

When ruling on a summary judgment motion, I must construe the facts in the light most

favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable

inferences against the moving party.  *Anderson*, 477 U.S. at 255.  When a motion for summary

judgment is properly supported by documentary and testimonial evidence, however, the

nonmoving party may not rest upon the mere allegations or denials of its pleadings, but rather

must present significant probative evidence to establish a genuine issue of material fact.  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

If the nonmoving party has failed to make a sufficient showing on an essential element of

its case with respect to which it has the burden of proof at trial, then summary judgment is

appropriate.  *Celotex*, 477 U.S. at 322.  In such a situation, "there can be 'no genuine issue as to

any material fact,' since a complete failure of proof concerning an essential element of the

nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at 322-23; *accord*

*Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir. 1995) (movant's

burden satisfied if he can point to an absence of evidence to support an essential element of

nonmoving party's claim).

## II.   Factual Background

### A.   Background Concerning Britestarr and the Oak Point Site

Britestarr is a New York subchapter S corporation.  Def. 56(a)1 Statement & Pl. 56(a)2

Statement ("Statements") at ¶ 1.  Britestarr owns only one valuable asset: a parcel of

approximately twenty-eight acres of land in the Bronx, New York, known as the "Oak Point site." *Id.* at ¶ 2.

In 1988, Britestarr purchased the land for over $3 million with a loan from Lloyds Bank. *Id.* at ¶ 3. Lloyds took a mortgage on the property and a pledge of Britestarr's shares as security for the loan. *Id.* The bank also received personal guaranties from Friema Norkin ("Mrs. Norkin"), who was then Britestarr's sole shareholder, and her husband, David Norkin ("Norkin"), who was then Britestarr's president. *Id.* at ¶ 4. After bringing suit in federal court, Lloyds eventually wrote off the loan. *Id.* at ¶¶ 10 & 13.[2]

### B.    Loan from Galea and Kruse

In 1995, Norkin borrowed over $500,000 from two lenders: Craig Galea and Mark Kruse. Statements at ¶ 17. That loan was secured with mortgages on Britestarr's property. In 1996, following a dispute with Norkin, Galea and Kruse filed suit against Britestarr and Norkin. *Id.* at ¶ 18.

### C.    ABB Option Agreement

On December 31, 1998, Britestarr entered into an option contract with ABB Equity Ventures (formerly ABB Energy Ventures) ("ABB"). *Id.* at ¶ 21; def. ex. 31. ABB envisioned constructing a power plant on the Oak Point site. Statements at ¶ 21. Under the Option Agreement, ABB acquired a three-year option to purchase the property. *Id.* at ¶ 22. In exchange, ABB agreed to pay Britestarr up to $1.4 million over the three-year period. *Id.* If ABB ultimately exercised its option under the contract, it would pay Britestarr at least $31.4 million

---

[2] The Norkins separated in 1989. *Id.* at ¶ 6; def. ex. 27 at 5. The parties dispute the ownership of Britestarr's shares following their separation. Ownership of Britestarr's shares is discussed below.

for the land.  *Id.* at ¶ 24.  Alternatively, Britestarr could elect to take the purchase price in the form of an equity interest in ABB's power plant project.  *Id.*  The Option Agreement did not impose any limitation on Britestarr's use of the option payments.  *Id.* at ¶ 26.

As a condition of the closing, the Option Agreement required Britestarr to deliver the property free and clear of liens.  *Id.* at ¶ 25.  Nothing, however, prevented Britestarr from using the sale proceeds to extinguish liens and creditors' claims at closing.  *Id.*

In approximately October 2000, ABB claimed to have first learned of Galea and Kruse's lawsuit against Britestarr.  *Id.* at ¶ 31; def. ex. 35 at ¶ 5.  ABB asserted that the litigation raised doubts about Britestarr's ability to convey the property.  In November and December 2000, ABB and Britestarr (through its counsel, Mitchell Fenton of Buchanan Ingersoll) communicated regarding the Option Agreement and issues related to the creditors' claims on the property. Statements at ¶ 32; def. exs. 36-43.  Piper, whom Britestarr had retained to assist it in developing the Oak Point site, pl. ex. 8, received copies of some of that correspondence.  Statements at ¶ 32.

On November 29, 2000, ABB declared that Britestarr had defaulted under the Option Agreement because of the Galea/Kruse litigation.  *Id.* at ¶ 34; def. ex. 41.  Based on the alleged default, ABB claimed the right to withhold the $300,000 option payment that was otherwise due on December 1, 2000.  Statements at ¶ 34.  Britestarr in turn declared ABB in default for failing to make that payment.  *Id.* at ¶ 35; def. ex. 43.  The Option Agreement provided ABB with ninety days to cure its default.  Statements at ¶ 36; def. ex. 31 at ¶ 6(c).  During that period, ABB presented Britestarr with several proposals for extending the Option Agreement.  Statements at ¶ 38; def. exs. 44, 46, 51-54.  In one, ABB proposed putting future option payments into a pool to pay off Britestarr's and Norkin's creditors.  *Id.* at ¶ 37; def. ex. 51 at § 2.5.  In February 2001,

ABB, in fact, paid Galea and Kruse $275,000 to forbear from foreclosing on the Oak Point property for eighteen months.  *Id.* at 38; def. ex. 49.

On March 13, 2001, ABB withdrew all outstanding offers concerning an extension of the Option Agreement.  Statements at ¶ 42; def. ex. 54.  That same date, ABB filed suit in New York state court, seeking assurances that Britestarr would perform its alleged obligations under the Option Agreement.  Statements at ¶ 43; def. ex. 55.  Buchanan Ingersoll represented Britestarr in that litigation.  Statements at ¶ 43.  The court issued a temporary restraining order that prohibited Britestarr from attempting to sell the Oak Point property.  *Id.*; def. ex. 55.

D.       Negotiations with Mirant

Britestarr met with another potential purchaser of the Oak Point site, Mirant Americas Corp. ("Mirant") on March 14, 2001.  Piper served as Britestarr's counsel during those negotiations.  *Id.* at ¶ 49.  After the TRO expired and the New York Appellate Division had affirmed the denial of ABB's motion for preliminary injunction, Britestarr resumed negotiations with Mirant.  *Id.* at ¶ 48.  During those discussions, Britestarr made clear that the termination or expiration of ABB's option was a condition precedent to any sale of the land.  *Id.*; def. ex. 58.  The law firm Paul, Hastings, Janofsky & Walker represented Mirant during the negotiations with Britestarr.  *Id.* at ¶ 50.  Those negotiations ended in late 2001 after Mirant began experiencing severe financial troubles.  *Id.* at ¶ 51.

Piper represented Mirant's predecessor, Southern Energy Inc., and a Mirant subsidiary during 2000 and 2001 in transactions unrelated to Britestarr.

E.     Ownership of Britestarr Stock

Meanwhile, in the summer of 2001, ABB learned that Lloyds Bank had retained Mrs.

Norkin's original stock certificate, taken as security for her personal guaranty in 1988.   *Id.* at

¶ 52.  ABB offered $495,000 to Lloyds in exchange for whatever rights it held.  *Id.* at ¶ 54.

Lloyds accepted that offer.  *Id.*  ABB also offered Mrs. Norkin at least $450,000 and up to $1.5

million if she would reaffirm her liability on her personal guaranty.  *Id.* at ¶ 55.  Mrs. Norkin

accepted ABB's offer.  *Id.*  Lloyds agreed to accept Mrs. Norkin's shares in Britestarr in full

satisfaction of her indebtedness on her personal guaranty.  *Id.*

In December 2001, ABB filed two new lawsuits, one against Britestarr in the Bronx and

the other against Norkin in Bankruptcy Court in Connecticut.  Both lawsuits centered on the

issue of the ownership of Britestarr's stock.

Oak Point Property has repeatedly asserted that it "owns rights to the equity" in Britestarr,

def. ex. 129, or that it "holds a pledge of all of the issued and outstanding shares of capital stock

of Britestarr."  Def. ex. 133 at 6, ¶ 9.A.(iii).

F.     March 2002 Renewed Negotiations Between Britestarr and ABB

On March 4, 2002, ABB representatives met with Norkin's personal bankruptcy counsel

and the Piper lawyers then representing Britestarr.  *Id.* at ¶ 59.  The parties did not reach an

agreement at that meeting.

G.     Bankruptcy Filing

At that same time, Britestarr was defending three lawsuits: the two suits brought by ABB

in New York and a third suit for unpaid fees brought by a former attorney.  Statements at ¶ 15;

def. ex. 55; def. ex. 73; def. ex. 76.  In addition, by that spring, ABB had filed a lis pendens

against Britestarr's real property.  Statements at ¶ 69; def. ex. 57.

In May 2002, Piper recommended that Britestarr file for bankruptcy protection under Chapter 11 and request the appointment of a Chapter 11 trustee.  Statements at ¶ 71; def. ex. 4 (Califano Tr.) at 32-35.  Piper also persuaded Norkin to step down as Britestarr's president.  Pl. ex. 19 (Norkin Tr.) at 29.

On May 20, 2002, Britestarr filed its Chapter 11 petition in the Southern District of New York, where Britestarr is incorporated and where its property is located.  *Id.* at ¶ 73; def. ex. 83 at ¶ 1.  Shortly thereafter, the case was transferred to the District of Connecticut.  On June 18, 2002, Mrs. Norkin and the Chapter 7 trustee overseeing Norkin's personal bankruptcy estate adopted a resolution to appoint one of ABB's officers, Steven Smith, to be Britestarr's sole director.  Statements at ¶ 77; def. ex. 87.  Smith was an ABB vice-president and the project manager of the Britestarr/Oak Point development.  Pl. Ex. 7 at ¶ 4.  That same day, Smith elected himself to serve as Britestarr's president.  *Id.* at ¶ 78; def. ex. 87.

There is no evidence in the record to suggest that Smith ever sought to extend Britestarr's Option Agreement with ABB or that he ever sought to dismiss Britestarr's bankruptcy case after he became Britestarr's sole director and president.  Def. 56(a)1 Statement at ¶ 81.  Britestarr purports to dispute whether Smith ever sought to extend the Option Agreement or to dismiss the bankruptcy case.  Pl. 56(a)2 Statement at ¶ 81.  The only evidence it has marshaled, however, is Smith's testimony that he and others did "attempt to conceive of a way to move forward to exit bankruptcy and to continue the development process."  Pl. ex. 7 (Smith Aff.) at ¶ 12.

In addition, following Britestarr's bankruptcy filing, ABB continued to pursue the Britestarr project for several months.  Both Smith and ABB's general counsel, Robert Henry,

continued work on the project until September 2002.  Statements at ¶ 83; def. ex. 11 (Hutchison

Tr.) at 109, 140.

     H.    <u>ABB's Withdrawal from Power Projects</u>

In September 2002, ABB withdrew from all of its power projects in the United States

because of a strategic decision to focus on its core businesses: automation, transmission and

distribution.  Statements at ¶ 81; def. ex. 11 (Hutchison Tr.) at 33-34, 48-49.  The Britestarr/Oak

Point project was among the power projects from which ABB withdrew.  *Id.*  Although Britestarr

denies that ABB withdrew from the Oak Point project solely because of that shift in focus, pl.

56(a)2 statement at ¶ 82, it is undisputed that ABB withdrew from all its power projects in the

United States in September 2002.  It communicated that decision and requested proposals for

purchasing the projects in four identical letters.[3]  Def. exs. 90-93.

     I.    <u>Oak Point Energy LLC</u>

In September 2002, ABB's parent company was "in dire financial straights."  Statements

at ¶ 88; def. ex. 18 (Smith Tr.) at 117-18.  In an agreement dated October 31, 2002, ABB

conveyed its development rights in the Britestarr project to Oak Point Energy LLC ("Oak Point

Energy"), a new company owned by Smith.  Statements at ¶ 89; def. ex. 95.  Under that purchase

agreement, the price paid by Oak Point Energy will be reduced by any amount that ABB recovers

on its claim in Britestarr's bankruptcy case.  Statements at ¶ 91; def. ex. 95 at § 1.4(c).

---

[3] Each letter contained the same typographical errors, including listing the date as
September 4, 2001, rather than September 4, 2002.  The letters were addressed to four
individuals who were acquainted with or expressed interest in the projects and listed the
minimum purchase price for each project as well as the general structure of any transactions
transferring ABB's development rights.

J.    Current Ownership of Britestarr

The parties dispute the ownership of Britestarr's shares subsequent to the Norkins'
separation.  Piper contends that Mrs. Norkin conveyed her interest in the shares to her husband.
56(a)1 Statement at ¶ 6; def. ex. 23.  Britestarr asserts that she did not and points to an adversary
proceeding pending against Norkin's bankruptcy estate that is aimed at resolving the issue of
ownership of Britestarr's shares.  56(a)2 Statement at ¶ 6; def. ex. 72 at 6.  In that litigation, Oak
Point Property, Inc., another of Smith's companies, alleges that Mrs. Norkin pledged her shares
in Britestarr to Lloyds, that the bank obtained and maintained a valid and perfected first priority
security interest in all the shares, and that Lloyds assigned that interest to ABB in 2001.  Def. ex.
72 at 6-7.

In Britestarr's bankruptcy case, Oak Point Property, Inc., has repeatedly asserted
ownership of the equity interest in the company.  *E.g.*, Def. ex. 129 ("Oak Point Property, Inc.
. . . owns rights to the equity in [Britestarr]").

K.    Piper's Representation of TransGas

Piper has served as project counsel for TransGas Energy System LLC ("Transgas"), the
developer of a proposed power plant in Brooklyn.  Statements at ¶ 93; def. ex. 103, nos. 63-64.

The TransGas project is one of several proposed power projects in the greater New York
City metropolitan area, and among at least three that have obtained financing and commenced
construction since 2001.  Statements at ¶ 94; def. ex. 2 at 38-39.

L.    Escrow Account

Piper opened an escrow account for Britestarr.  Britestarr deposited just over $1 million
in ABB option payments into the escrow account.  Statements  at ¶ 28.  Piper disbursed funds

from the account at the direction of Norkin, and many of the disbursements went directly to him.

*Id.* at ¶ 29.[4]

M.     Current Status of Britestarr's Bankruptcy Case

In its pending Chapter 11 bankruptcy case, Britestarr proposed a plan of reorganization

pursuant to Chapter 11 of the Bankruptcy Code, 11 U.S.C. §§ 1101 *et seq*.  Def. ex. 127 (Second

Amend. Plan of Reorganization).  The Bankruptcy Court confirmed the Plan, dated March 31,

2004, on June 29, 2004.

Under the terms of the Plan of Reorganization, once certain conditions are satisfied, the

Oak Point property is to be transferred to Britestarr's successor, Oak Point Property LLC, free

and clear of all claims, encumbrances, and other interests, other than those expressly provided for

in the Plan.  *Id.* at 15, Article 7.2.  Oak Point Property, Inc., is the sole member of Oak Point

Property LLC.  *Id.* at Schedule 7.1, Schedule 1.  Oak Point Property, Inc.'s capital contribution to

Oak Point Property LLC is $30,575,192.89.  *Id.*  Under the Plan, Britestarr's successor, *i.e.*, Oak

Point Property LLC, is to make all payments to creditors.  *Id.* at 15, Article 7.3.

The Plan's definition of "Closing Date" sets forth the conditions precedent to the transfer

of the property:

> "Closing Date" means the first date on which (a) the order confirming this
> plan is a Final Order, (b) all of the Claims against the Debtor's estate are
> Allowed by the passage of time or the entry of a Final Order, (c) and the
> Debtor and/or Successor has a remediation plan approved by the State of New
> York's Department of Environmental Conservation and (d) the Successor has
> obtained the Plan Financing . . . .

*Id.* at 5, Article 1.1.13.  Only if those conditions are not timely satisfied will the Oak Point

---

[4] Britestarr disputes whether Norkin requested disbursements as president of Britestarr or
in his personal capacity.  *See* Pl. 56(a)(2) Statement at ¶ 29.  That distinction is discussed below.

property will be sold at auction under the auspices of the Bankruptcy Court. *Id.* at 16, Article 7.4.

In March 2005, the Bankruptcy Court granted the motion of Britestarr and Oak Point Property, Inc., to extend Britestarr's time to satisfy the conditions precedent to the Closing Date. That deadline has now been extended until 180 days after the conclusion of a mediation ordered by the Bankruptcy Court.[5]  *See* Order Approving Enlargement of Time to Satisfy Conditions Precedent to Closing Date, *In re* Britestarr Homes, Inc., Case No. 02-50811 (Bankr. D. Conn. Mar. 22, 2005).  In sum, despite the bankruptcy filing, to date Britestarr has retained ownership of the Oak Point site.  Britestarr has proposed a Plan of Organization – that the Bankruptcy Court has confirmed – under which Smith's companies will succeed Britestarr.  The Plan specifies that ownership of the property will pass to Oak Point Property LLC, and the latter will make all payments to Britestarr's creditors.  Steve Smith, acting as president of Britestarr, authorized the Plan under which his companies will succeed Britestarr and the terms of that succession.  Def. ex. 127 (Second Amend. Plan of Reorganization) at 26.

## III.   Discussion

Under New York law,[6] claims of breach of fiduciary duty, aiding and abetting a breach of fiduciary duty, civil conspiracy, and legal malpractice each include as an essential element: damages caused by the alleged tort.  *See S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 847-48 (2d Cir. 1987) (setting forth elements of a breach of fiduciary duty); *In re Sharp Intern. Corp.*, 403

---

[5] The mediation seeks to resolve a dispute between Britestarr and one of its creditors, the New York City Department of Finance.  *See* Order Referring Matters to Mediation, *In re* Britestarr Homes, Inc., Case No. 02-50811(Bankr. D. Conn. Feb. 1, 2005).

[6] The parties agree that New York law governs Britestarr's claims.

F.3d 43, 49 (2d Cir. 2005) (aiding and abetting a breach of fiduciary duty); *Kashi v. Gratsos*, 790 F.2d 1050, 1055 (2d Cir. 1986) (civil conspiracy); *Hydro Investors, Inc. v. Trafalgar Power, Inc.*, 227 F.3d 8, 15 (2d Cir. 2000) (professional malpractice).  Assuming that Piper breached its fiduciary duty to Britestarr, aided and abetted Norkin in breaching his fiduciary duty, conspired with Norkin to breach their fiduciary duties, or committed legal malpractice, Britestarr has failed to produce evidence from which a reasonable jury could conclude that Britestarr suffered damages as a result of Piper's conduct.

To survive summary judgment on a claim of tortious interference with business relations, a plaintiff must provide evidence that the defendant's inference with a relationship between the plaintiff and a third party caused injury to that relationship.  *See Lombard v. Booz-Allen & Hamilton, Inc.*, 280 F.3d 209, 214 (2d Cir. 2002).  Britestarr has failed to produce evidence from which a reasonable jury could conclude that Piper's conduct caused injury to Britestarr's relationship with ABB.

Because Britestarr must raise a genuine issue of material fact with respect to each essential element of its claim to survive Piper's motion, summary judgment in favor of Piper is granted.  *See Celotex*, 477 U.S. at 322.

A.    Absence of Evidence that Piper's Conduct Caused Damages

Britestarr has alleged that Piper's conduct caused the following damages: (1) the lost opportunity to extend ABB's Option Agreement or to pursue the power project with another developer or by itself, and (2) the money that Piper disbursed from Britestarr's escrow account directly to Norkin.  Second Amend. Compl. at ¶¶ 71-78.

      1.    *Lost Opportunity*

With respect to the so-called lost opportunity claim, Britestarr has further categorized its damages in two parts: general damages of over $31 million, stemming from Piper's alleged interference with the ABB Option Agreement; and future lost profits, which Britestarr claims it would have earned after completion of a power plant on the Oak Point site.

The evidence in the record would not permit a reasonable jury to conclude that Piper's conduct – recommending bankruptcy protection and representing Britestarr during negotiations with ABB – caused Britestarr to lose the opportunity to sell its property to ABB or another developer or to develop the property itself.

      a.    ABB's Decision to Abandon the Oak Point Project

Britestarr argues that ABB abandoned the Oak Point project because of the difficulties ABB would have faced as a result of Britestarr's bankruptcy.  The evidence in the record would not, however, permit a reasonable jury to conclude that Piper's recommendation of bankruptcy protection and the subsequent bankruptcy filing caused Piper to withdraw from the project.

In September 2002, ABB withdrew from all three of its power development projects in the United States, including the Britestarr project.  ABB's corporate designee, Gregg Hutchison, testified that ABB withdrew from the projects because of a strategic decision to focus on its core businesses.  Def. ex. 11 at 33-34, 48-49.  Smith concurred that ABB sold its development rights in the Oak Point project as a result of ABB's "strategic decision to systematically exit the power development business."  Def. ex. 18 (Smith Tr.) at 122.

After Smith became president of Britestarr, he did not seek to dismiss the Britestarr bankruptcy case.  Robert Henry, ABB's former general counsel, testified that ABB "didn't think

bankruptcy was necessarily a bad thing," and explained that in bankruptcy, "you could see the light at the end of the tunnel." Def. ex. 10 at 155-56. Henry further testified that he "advocated we should be there [in bankruptcy court] because this is the only place we are going to be able to get this settled once and for all and have a clean slate." *Id.* at 156.

Britestarr counters by pointing to Smith's testimony that the bankruptcy caused ABB to withdraw from the Oak Point project.[7] Pl. Ex. 78 (Smith Tr. at 311-13); Pl. Ex. 82 (Smith Report at 2); Pl. Ex. 7 (Smith Aff. at ¶¶ 11-15). Considering each of those pieces of evidence in conjunction and in the light most favorable to Britestarr, a reasonable jury could not infer that Piper's conduct caused ABB's withdrawal from the project.

First, Smith testified that in his view Piper's "[p]utting the company in the bankruptcy clearly was some cowboy, last-ditch maneuver to keep ABB from doing what it clearly set out from the beginning . . . . All ABB wanted to do was develop this . . . project. I know because I was ABB, and all I wanted to do was go build a power plant in the Bronx." Pl. Ex. 78 (Smith Tr. at 313).[8] That testimony relates merely to Smith's view of Piper's intentions; it is not evidence that links ABB's decision to withdraw from the Oak Point power point project with Piper's recommendation that Britestarr file for bankruptcy.

---

[7] In support of its argument that the bankruptcy caused it to lose the ABB deal, Britestarr also points to Henry's affidavit in which he stated that the bankruptcy "was a factor considered by ABB EV when it decided to stop its pursuit of a power project on land then owned by Britestarr." Pl. ex. 86. Henry's statement does not, however, indicate whether the bankruptcy factor was viewed favorably or negatively by ABB, or whether it, in fact, impacted in any way the decision to abandon the project.

[8] Smith, whose employment with ABB was terminated in September 2002, acknowledged that he did not make the decision on ABB's behalf to withdraw from the project. Def. ex. 18 (Smith Tr.) at 121.

Second, Smith prepared a report, dated December 24, 2004[9], in which he asserted that "[b]y filing bankruptcy, Piper . . . eventually caused ABB to terminate its support for the Project."  Pl. Ex. 82 at 2.  He also stated that "[a]lthough a power project may someday be built at the site or the property may be sold, Piper's involvement caused a series of events to unfold that eliminated any chance that [Britestarr] might substantially benefit."  *Id.*

Third, in May 2005, Smith submitted an affidavit, again stating that ABB's activities relating to the development of the Oak Point project "were halted due to the Britestarr bankruptcy filing in May 2002."  Pl. ex. 7 (Smith Aff.) at ¶ 11.

Britestarr cannot survive summary judgment in reliance merely on Smith's conclusory report and affidavit.  At his deposition, Smith agreed that ABB withdrew from the Britestarr/Oak Point development as a result of ABB's strategic decision to exit the power plant industry.  He also admitted that he did not make the decision to withdraw even though he also testified that he "was ABB."

Smith's affidavit and report do address the relationship between Piper's conduct and ABB's involvement in the Oak Point development.  For example, in his report, Smith asserted:

> But for Piper's involvement, consisting of certain actions and detrimental advice (or lack of proper advice), ABB would have submitted and received a permit for the Project and having received a permit, ABB would have financed the construction or would have easily been able to sell the Project to another entity . . . .

Pl. ex. 82 (Smith Report) at 1.  The statements concerning the effect of Piper's conduct on ABB,

---

[9] Smith's report was drafted after he became president of Britestarr, after his companies – the Oak Point entities – asserted ownership of the development rights to the site, and after the Bankruptcy Court confirmed Britestarr's plan of reorganization.  Under that plan, if certain conditions are satisfied, the Oak Point entities will succeed Britestarr and own the Oak Point site outright.

however, are conclusory and do not reveal specific facts that would raise a genuine issue concerning causation of injury.  Thus, they are insufficient to satisfy Britestarr's "burden of coming forward with evidence directed to specific facts showing that there is a genuine issue for trial." *West-Fair Elec. Contractors v. Aetna Cas. & Sur. Co.*, 78 F.3d 61, 63-64 (2d Cir. 1996). Britestarr has not submitted evidence from which a reasonable jury could find that its then-president would have agreed to continue working with ABB, or that ABB would have continued the Oak Point development when it, indisputably, withdrew from all its power plant projects simultaneously for reasons unrelated to Piper's actions and advice.

b.      Continued Marketability of the Oak Point Site

Britestarr has argued that the bankruptcy filing damaged the marketability of the Oak Point property.  The evidence in the record, however, would not permit a reasonable jury to conclude that the bankruptcy filing affected Britestarr's ability to sell the property for well over $31 million, *i.e.*, more than $31.4 million purchase price in the Option Agreement and any lost option payments.

On the contrary, the record evidence demonstrates that the value and marketability of the Oak Point property did not suffer as a result of the bankruptcy filing.  First, in April 2004, the property was appraised at $36.75 million dollars.  Def. ex. 128.  Second, in a joint development agreement dated August 10, 2004, four of Smith's companies granted KeySpan Energy Development Corp. the option to purchase the remaining property and related contractual rights for $40 million.  Pl. ex. 56 at 2-3.  Finally, on May 23, 2005, the Oak Point entities granted to KEDC Holdings Corp. an option to purchase the remaining property and development rights for $42 million.  Def. ex. 133.

-16-

The joint development agreement and option agreement discussed above are contingent upon the Oak Point entities succeeding Britestarr as set forth in the Plan of Reorganization.  In each proposal or agreement, Britestarr is referred to as the owner of the site: "Fee title to the Oak Point Property is currently held by Britestarr Homes, Inc."  E.g., def. ex. 133 (option and purchase agreement dated May 23, 2005) at 6, Article 9.A.(ii).  Oak Point Property, Inc. is, for example, described as "the entity that currently holds a pledge of all of the issued and outstanding shares of capital stock of Britestarr."  *Id.* at Article 9.A.(iii).

Accordingly, Britestarr's claims that the value and marketability of its property decreased because of a forced sale in bankruptcy are not supported by the evidence in the record.[10] Britestarr owns the Oak Point property; there was no forced sale, and interested parties have continued to negotiate option agreements for increased purchase prices.  ABB's withdrawal from the Oak Point project did not cause Britestarr to lose the opportunity to sell its land for a price greater than the sum of the option price plus any missed option payments.  Based on the evidence in the record, a reasonable jury could not conclude that Britestarr's bankruptcy filing damaged its prospects for selling its real property at or above the total amount it would have received from ABB.

---

[10] Britestarr's briefs were misleading on this point.  In its sur-reply, for example, Britestarr asserted that "Britestarr was forced to sell to the Oak Point Entities the rights to Britestarr's sole asset under distressed circumstances and for far less than its out-of-bankruptcy value."  Pl. Sur-reply (doc. # 47-1) at 1.  Steve Smith, as president of Britestarr, submitted a Plan of Reorganization in Bankruptcy Court under which the ownership of the Oak Point site will transfer to Oak Point Property LLC.  Although the specific terms of the Plan of Reorganization may favor his companies – the Oak Point entities – rather than Britestarr, Britestarr was not "forced to sell" the property to the Oak Point entities.  Moreover, to date Britestarr, in fact, retains ownership of the land.

c.      Advice Surrounding Negotiations with ABB

In addition to its argument relating to the bankruptcy filing, Britestarr argues that Piper

committed malpractice and breached its duty to Britestarr during the negotiations between

Britestarr and ABB following the alleged default in November 2000 and again in March 2002.

(1)      November 2000 – March 2001

After ABB declared Britestarr in default under the Option Agreement, based on the

Galea/Kruse litigation in November 2000, ABB presented Britestarr with several proposals in an

effort to reach an agreement with Britestarr.

The parties dispute Piper's role in the failed negotiations between ABB and Britestarr

during that time period.  Piper claims that Norkin – on behalf of Britestarr – would not have

accepted a deal from ABB, irrespective of Piper's advice.  The defendant cites Norkin's response

to an ABB proposal in which Norkin referred to the proposal as an "abomination" and a "joke."

Def. 56(a)1 Statement at ¶ 39; def. ex. 14 at 168-69 & def. ex. 48.  Most significantly, Norkin

testified that he would not have signed an agreement containing the provisions that ABB

proposed.  Def. ex. 14 (Norkin Tr.) at 170.

Britestarr purports to deny that Norkin was opposed to ABB's proposals by suggesting

that he rejected them based on Piper's advice.  Pl. 56(a)2 Statement at ¶ 39, citing pl. ex. 19

(Norkin Tr.) at 9-12.  Britestarr does admit, however, that Norkin's note in response to one of

ABB's proposals was, according to Norkin, "short for saying FU."  Pl. 56(a)2 Statement at ¶ 40,

*citing* def. ex. 14 (Norkin Tr.) at 170.  Furthermore, Britestarr admits that Norkin testified that he

would "never" have signed an agreement containing the provisions that ABB proposed, def. ex.

14 (Norkin Tr.) at 169-70.  Nevertheless, Britestarr argues that the evidence suggests that Norkin

-18-

would have followed Piper's advice to accept ABB's proposal if the firm had advised that he do so.  Pl. 56(a)2 Statement at ¶ 41.  Britestarr points to Norkin's deposition testimony as evidence in support of that argument.  The two portions of Norkin's deposition that Britestarr cites are: pl. ex. 19 (Norkin Tr. at 21-22) ("I never really questioned [Attorney Willig] that much because I respect his judgment."), and pl. ex. 20 (Norkin Tr.) at 235 (Q: "Was there an instance when Piper Rudnik gave you advice and you refused to take it?  Norkin: "Not that I can remember.").

Considered in the light most favorable to Britestarr, that evidence would not permit a reasonable jury to infer that Norkin would have followed Piper's advice to accept ABB's proposal.  Norkin's deposition occurred after he entered into a joint prosecution agreement with Britestarr, def. ex. 132 at ¶ 1(b).  Norkin agreed to cooperate with Britestarr's prosecution of the instant case in exchange for payment of his legal fees and a share in any recovery against Piper. Despite that interest in the outcome of the instant case, Norkin testified that he never would have agreed to extending the Option Agreement under the terms ABB's proposed.  Notwithstanding Norkin's general testimony that he "respects" Willig and could not remember an instance when he failed to take the advice of Piper, there is no specific evidence from which a reasonable jury could find that the negotiations failed due to Piper's influence on Norkin or any malpractice by the firm.

### (2)     March 2002 Meeting

Britestarr also alleges that Piper's failure to recommend that Britestarr accept ABB's alleged proposal at the parties' March 2002 meeting constituted malpractice and a breach of its fiduciary duty to Britestarr.  Again, Britestarr, despite its arguments, has failed to raise a genuine issue of fact with respect to any claims based on Piper's conduct during the March 2002

negotiations.

The parties dispute Piper's role during the meeting in March 2002. Piper claims that, although all of the parties were interested in resolving their dispute at that time and ABB was willing to discuss extending the Option Agreement, there is no evidence that either party made a specific proposal to settle the dispute at that meeting. Def. 56(a)1 Statement at ¶ 59; def. ex. 1 (Beatman Tr.) at 179-83; def. ex. 10 (Henry Tr.) at 244. Britestarr purports to dispute that claim, although the plaintiff has pointed to no evidence that suggests ABB presented Britestarr with a specific proposal or any evidence from which a reasonable jury could infer that Norkin, as Britestarr's sole officer and director, was willing to entertain an offer from ABB.

Viewed in the light most favorable to Britestarr, the evidence shows that ABB approached the meeting with an interest in settling, and the Piper lawyers were pessimistic about settling with ABB. There is no evidence, however, that Piper failed to recommend an offer or that Norkin, who has testified that none of the terms of ABB's earlier settlement offers would have been acceptable, would have accepted an offer to extend the option agreement had Piper recommended it.

First and foremost, Britestarr has not produced evidence that would permit a reasonable jury to answer affirmatively the threshold question whether ABB made an offer to extend the option agreement during the March 2002 meeting attended by counsel for ABB and Britestarr as well as Norkin's personal bankruptcy counsel. ABB's former general counsel, Robert Henry, did testify with respect to the general terms on which ABB was willing to settle in March 2002, but he was not present at the meeting and did not testify that ABB made a specific proposal during the relevant negotiations. Pl. Ex. 21 (Henry Tr. at 220-22, 244) ("[W]e were always willing to

work things out with them . . . .  We were always hopeful that we could work it out somehow.").

At best, Henry testified that ABB sought to "preserve the basic economics" of the parties' deal

and not make it any "less sweet."  Pl. ex. 21 (Henry Tr.) at 222. Henry's testimony would not

permit a reasonable jury to find that ABB actually made an offer in March 2002 or that Piper

recommended its client to reject such an offer.

Furthermore, there is no evidence from which a reasonable jury could infer that Britestarr

would have accepted an offer to extend the ABB Option Agreement had Piper recommended it.

As discussed above, Britestarr's then-president and sole director, Norkin, testified that ABB's

January 2001 proposal was an "abomination" and a "joke."  Def. ex. 14 (Norkin Tr.) at 169-70.

Significantly, Norkin gave that testimony after entering into an agreement with Britestarr to share

in any recovery awarded in its favor in the instant litigation.  Despite his interest in the outcome

of Britestarr's malpractice lawsuit against Piper, Norkin testified that he "never would have

signed" the January 2001 agreement.  *Id.* at 170.  Likewise, he testified with respect to a March

21, 2001, proposal that "none of this would have been acceptable" and that he "would have

rejected it."  *Id.* at 179, 181.

 There is no evidence in the record from which a reasonable jury could find that Norkin

would have extended the Option Agreement under terms similar to those contained in the earlier,

rejected ABB proposals, if Piper had recommended it.

Thus, even assuming that Piper breached a fiduciary duty owed Britestarr or otherwise

committed legal malpractice, Britestarr has failed to raise a genuine issue of fact regarding any

claims of damages or injury to a business relationship stemming from Piper's conduct during the

March 2002 negotiations.

          d.      Lost Future Profits

In addition to its general damages claim in the amount of the Option Agreement's purchase price and lost option payments, Britestarr also seeks to recover lost profits.  Britestarr claims that it would have derived profits from project participation in a power plant constructed on the Oak Point site, whether developed by ABB, another developer, or Britestarr itself. Britestarr argues that, absent the Piper-initiated bankruptcy, the project would have been developed and would have proven profitable for Britestarr.

Lost future profits are available as damages under New York law.  *See Kenford Co. v. Erie County*, 67 N.Y.2d 257, 261 (1986).  In order to recover lost profits, however, the New York Court of Appeals has held that "the alleged loss must be capable of proof with reasonable certainty."  *Id.  Kenford* involved a breach of contract calling for the construction and operation of a domed sports stadium.  *Id.* at 260.  The court discussed the plaintiff's lost profits claim and set forth the following standard: "damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes."  *Id.* at 261.  Additionally, the court noted that, with respect to a new business seeking to recover for loss of future profits, "a stricter standard is imposed . . . [because] there does not exist a reasonable basis or experience upon which to estimate lost profits with the requisite degree of reasonable certainty."  *Id.*

The Court of Appeals acknowledged that the plaintiff in *Kenford* had produced a "massive" quantity of proof that represented "business and industry's most advanced and sophisticated method for predicting the probable results of contemplated profits."  *Id.* Nevertheless, the Court ruled that the proof was insufficient to meet the required standard because the expert conclusions were "still projections, and as employed in the present day

-22-

commercial world, subject to adjustment and modification." *Id.* Finally, the Court remarked that "it is axiomatic that the degree of certainty is dependent upon known or unknown factors which form the basis of the ultimate conclusion." *Id.*

In order to satisfy its burden with respect to lost profits, Britestarr has offered the expert testimony of Lynda Borucki, a financial economist.[11] Borucki's testimony, however, is based on the assumption that Piper's conduct halted the development of the Oak Point site. Def. ex. 101 (Borucki Report) at 3. Moreover, her testimony regarding the construction and development of a power plant site is outside the scope of her claimed expertise. Finally, the speculative nature of Borucki's assumptions undermines her ultimate conclusions and would not permit a reasonable jury to find that her conclusions are reasonably certain. *See Kenford*, 67 N.Y.2d at 262. Britestarr's allegations of lost profits are, therefore, insufficient to withstand Piper's motion for summary judgment.

First, Borucki's report is based on her understanding that Piper's conduct twice halted the development of the Oak Point site. Def. ex. 101 (Borucki Report) at 3 (setting forth assumption that Piper's conduct caused ABB to suspend permitting and developing the site in October 2000 and March 2002). As discussed above, the plaintiff has failed to raise a triable issue of fact with respect to whether Piper interfered with ABB and Britestarr's negotiations or whether the

---

[11] Borucki's report includes opinions regarding the various permitting and construction contracts that would be required for the development of the Oak Point site as a power plant. Def. ex. 101 (Borucki Report). Questions regarding the likelihood of success in obtaining the required permitting and construction contracts to develop a power plant lie beyond the sphere of ordinary jurors. Thus, a jury, unaided by expert testimony, would be unable to make the factual findings necessary to determine whether, absent any misconduct on the part of Piper, ABB or another developer would have succeeded in development of the property. *Cf. Fane v. Zimmer*, 927 F.2d 124, 131 (2d Cir. 1991). Accordingly, Britestarr must produce expert testimony regarding its claims that Piper's conduct caused Britestarr to lose its development opportunity and the prospective profits flowing therefrom.

recommendation to file bankruptcy caused Britestarr any harm.  For that reason alone, the plaintiff has failed to raise a triable issue with respect to its claim for lost profits.

In addition, Borucki's expert report encompasses testimony regarding subjects beyond her areas of claimed expertise.  Britestarr's expert is a financial economist with expertise in "damages, valuation, electricity price forecasting, and knowledge of the electric industry."  Def. ex. 101 (Borucki Report) at 1.  A "substantial focus" of her practice has been in the electric industry, and she has consulted on the "valuation of energy assets as well as on the provision and theory of . . . electricity price forecasts."  *Id.*

In this case, Borucki was asked, among other things, to determine whether the "contemplated power project would have been successfully developed."  *Id.* at 2.  She concluded that "it is more likely than not, that the Oak Point Power project would have had a developer, that it would have been permitted, obtained financing and been constructed, thereby generating the cash flows to Britestarr as contemplated by The Option Agreement."  *Id.* at 4.  That conclusion, however, is outside the realm of Borucki's expertise as a financial economist.  Moreover, Borucki does not even claim expertise in power plant development or permitting.

Borucki is not qualified to testify with respect to the likelihood that the Oak Point site would have been successfully permitted.  More specifically, she is not qualified to testify regarding the ability of a developer to obtain the necessary permits before December 31, 2002, the expiration date of Article X, New York's former streamlined rules for obtaining the permits required for new power plants; yet the assumption that Britestarr would meet the December 31, 2002 deadline is essential to her damages calculation.  *See* def. ex. 101 (Borucki Report) at 14. Borucki acknowledged during her deposition that she had not even heard of some of the permits that would be required as part of the project.  Def. ex. 2 (Borucki Tr.) at 16-21.

-24-

Although Borucki's report included several conclusions on issues surrounding the successful development of the Oak Point site, her opinions on those matters are not those of a qualified expert. Without the expertise to offer an opinion on the disputed issues, Borukci's conclusions become mere assumptions, and, therefore, are insufficient to satisfy Britestarr's burden.

Finally, Britestarr's proof fails to satisfy the standard of reasonable certainty required under *Kenford* and its progeny. The Second Circuit has applied *Kenford* to hold that future lost profits damages were not recoverable despite "lengthy testimony and voluminous documentation," *Trademark Research Corp. v. Maxwell Online, Inc.*, 995 F.2d 326, 333 (2d Cir. 1993). The Court would not permit the lost profits claim to reach a jury where the "data concerning the future sales and profits of a turnaround company in a market being transformed by technology is . . . a network of conjecture. *Id.* at 333-34. Here, Britestarr, a company with virtually no record of any kind, seeks to recover lost profits damages by arguing that it would have overcome permitting, construction, and financing obstacles either itself or through an agreement with ABB or another developer. Britestarr cannot satisfy the demanding standard for an award of future lost profits through Borucki's report, which on the critical issue of obtaining development approval by December 31, 2002 amounts to a "network of conjecture."

2.    *Disbursements from Escrow*

Britestarr also claims that Piper committed malpractice, breached its fiduciary duties, aided and abetted Norkin in breaching fiduciary duties, or conspired with Norkin to breach their fiduciary duties when it disbursed funds from an escrow account directly to Norkin. Britestarr has failed, however, to raise a genuine issue of material fact concerning any damages that Piper caused Britestarr when it disbursed funds from the escrow account.

It is undisputed that Britestarr is a subchapter S corporation, and that at the relevant times, Norkin was Britestarr's sole officer, director, employee, and authorized agent.

Britestarr's eminent expert, Professor Geoffrey Hazard, testified that the requisite standard of care prohibited Piper from distributing funds from the escrow account without following certain formalities.  Def. ex. 9 (Hazard Tr.) at 87.  In his expert report, Hazard states:

> In my opinion Piper failed to conform its conduct to recognized professional standards in disbursing money to Norkin in response to his requests.  Standard practice would entail a request by Norkin in his capacity as president of Britestarr and a disbursement in the name of Britestarr to an account in Britestarr's name.  It would also involve a statement of purpose for use of the money, for example, operating expenses, payments to engineers, etc.

Pl. ex. 59 at ¶ 4.

Britestarr has, thus, produced evidence sufficient to reach a jury with respect to whether Piper breached the required standard of care in its handling of the escrow account.  With respect to the disbursements from the escrow account, Britestarr has, however, failed to produce evidence that any misconduct on the part of Piper caused Britestarr damages.  Norkin acknowledged that he would have acquiesced if Piper had required that he make requests on Britestarr letterhead, signed as Britestarr's president.  Def. ex. 14 at 147.  It is also undisputed that Norkin was the president and sole director of Britestarr during the relevant time period and, as such, had complete control over Britestarr's accounts.  Even if Piper had deposited withdrawals from the escrow account into Britestarr's accounts, therefore, Norkin had the ability to withdraw the money from those accounts without Piper's acquiescence.  Thus, no reasonable jury could find that, but for Piper's failure to comply with required formalities concerning the escrow account, Norkin would not have been able to obtain those funds for his personal use.

B.        Absence of Evidence of Damages Resulting from Alleged Conflicts of Interest

Finally, Britestarr has claimed that Piper was laboring under multiple conflicts of interest while representing Britestarr.  Assuming there were conflicts of interest, Britestarr has failed to produce evidence that it suffered any damages as a result of those conflicts.

1.     *Piper's Representation of Mirant*

Piper represented Mirant's predecessor, Southern Energy Inc., and a Mirant subsidiary during 2000 and 2001 in transactions unrelated to Britestarr.  Def. ex. 103, nos. 63 & 64. Britestarr contends that, as a result, Piper had a conflict in representing Britestarr during its negotiations with Mirant.  There is no evidence, however, either that Piper's representation of Britestarr was affected in any way by the alleged conflict or that Britestarr suffered any damages as a result of the alleged conflict.

2.     *Piper's Representation of TransGas*

Finally, Britestarr argues that Piper's representation of TransGas, a competitor of Britestarr, constituted a conflict.  With respect to the required standard of care, Britestarr's expert, Professor Hazard, testified that a law firm may represent two clients within the same industry without having a conflict of interest.  Def. ex. 9 at 32.  Although Piper might have operated under a conflict of interest if Britestarr and TransGas were in competition for a "unique business opportunity," *id.*, there is no such evidence.  Hazard's supplemental expert report assumes that the power market in New York would have only supported one new power source during the relevant time period, resulting in a "strategic bottleneck" akin to a unique business opportunity.  Pl. ex. 59 (supp. letter dated Oct. 28, 2004).  There is no evidence in the record to support that assumption.

In its opposition brief, Britestarr argues that the TransGas and Oak Point projects

competed head-to-head in submitting bids for a ten-year power purchase agreement.  Opp. Brief

at 24.  Britestarr did not, however, submit the bid for the Oak Point project, which was made in

late 2002.  Rather, United American Energy Corp. and Smith's company, Oak Point Energy,

submitted the bid relating to development on the Oak Point site.  Evidence of those bids does not

support the contention that, during Piper's simultaneous representation, Britestarr and TransGas

competed for a unique business opportunity.

## IV.  Conclusion

Because Britestarr has failed to raise a genuine issue of material fact with respect to

damages and injury to a business relationship, I grant Piper's motion for summary judgment

(doc. # 18) with respect to all claims.[12]  The clerk shall enter judgment and close the case.

It is so ordered.

Dated at Bridgeport, Connecticut, this 28th day of September 2006.


/s/ Stefan R. Underhill
Stefan R. Underhill
United States District Judge

---

[12] I note that I have considered the parties' supplemental briefing on Britestarr's theories related to damages.  Specifically, I considered the briefs attached as exhibits to Piper's motion for leave to file a supplemental brief (doc. # 68) and Britestarr's motion for leave to file a sur-reply (doc. # 73).